IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MONTANA
BILLINGS DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>v.<br><br>JENNIFER MICHELLE HALL,<br><br>Defendant. | CR 23-130-BLG-SPW<br><br>ORDER |

On November 25, 2024, Defendant Jennifer Michelle Hall moved to dismiss Count 3 of the indictment charging her with being a prohibited person in possession of a firearm in violation of 18 U.S.C. § 922(g)(3) based on the United States Supreme Court's decisions, *New York State Rifle & Pistol Ass'n, Inc. v. Bruen*, 597 U.S. 1 (2022) and *United States v. Rahimi*, 602 U.S. 680 (2024). (Docs. 59, 60). Hall challenges the statute as unconstitutional under the Second Amendment as-applied to the facts of her case. (Doc. 60 at 3).

The Government responded on December 6, 2024, opposing the motion. (Doc. 61). On December 13, 2024, Hall countered that the Government did not meet its burden under the *Bruen* and *Rahimi* frameworks. (Doc. 62). To support her challenge, Hall relies on Fifth Circuit precedent in *United States v. Connelly*, 117

F.4th 269 (2024), which found § 922(g)(3) unconstitutional as-applied to the defendant in the case. (*Id.*).

Based on the parties' briefing and for the following reasons, the Court denies Hall's motion.

## I. Background

According to the Government, on December 4, 2021, the Missouri River Drug Task Force ("Task Force") executed a search warrant on Hall's residence in Livingston, Montana. (Doc. 61 at 2). During the search, the Task Force discovered methamphetamine, fentanyl, and a loaded firearm—a Raven Arms model MP-25 .25 caliber semi-automatic pistol. (*Id.*). Hall admitted to possessing the firearm and the methamphetamine. (*Id.*). Hall stated that she kept the firearm for "sentimental value" and for protection. (Doc 62 at 6; Doc. 61 at 2). She also admitted to being a methamphetamine addict who uses intravenously. (Doc. 61 at 2). After obtaining a search warrant for her phone, law enforcement discovered text messages demonstrating Hall's drug use and sales throughout 2021. (*Id.*).

On November 2, 2023, Hall was charged with three counts: (1) conspiracy to possess with intent to distribute methamphetamine in violation of 21 U.S.C. § 841(a)(1); (2) possession with intent to distribute methamphetamine in violation of 21 U.S.C. 841(a)(1); and (3) prohibited person in possession of a firearm in violation of 18 U.S.C. § 922(g)(3). (Doc. 2). The instant motion pertains only to Count 3.

## II. Legal Standard

Federal Rule of Criminal Procedure 12(b)(1) provides that a party may raise by pretrial motion any defense, objection, or request that the Court can determine without a trial on the merits. A pretrial motion is proper when it involves questions of law rather than fact. *United States v. Shortt Acct. Corp.*, 785 F.2d 1448, 1452 (9th Cir. 1986). The Court has determined Hall's motion is appropriate for pre-trial resolution because it solely involves a question of law.

## III. Analysis

Section 922(g)(3) states in pertinent part: "[i]t shall be unlawful for any person . . . who is an unlawful user of or addicted to any controlled substance . . . to . . . possess in or affecting commerce, any firearm or ammunition." A controlled substance includes methamphetamine. 21 U.S.C. § 812 sched. II, III. Hall argues that the statute is unconstitutional because it violates her Second Amendment under the Supreme Court's decisions in *Bruen* and *Rahimi*. (Doc. 60). The Government disagrees. It argues that pre-*Bruen* Ninth Circuit precedent upholding § 922(g)(3) precludes Hall's challenge. (Doc. 61 at 4–6). Alternatively, it argues that the statute remains constitutional under *Bruen* because of analogous historical regulations to § 922(g)(3). (*Id.* at 6–12). In reply, Hall counters that the Government's "paucity of Founding-era regulations" in its *Bruen* analysis do not support upholding § 922(g)(3). (Doc. 62 at 1).

While the Court agrees with Hall that the Government generally missed the mark in its application of the *Bruen* and *Rahimi* frameworks, it is otherwise correct that § 922(g)(3) remains constitutional as-applied to Hall. The Court will address the parties' arguments below.

*A.    Ninth Circuit Precedent*

In 2011, the Ninth Circuit upheld § 922(g)(3)'s constitutionality against a Second Amendment challenge. *United States v. Dugan*, 657 F.3d 998 (9th Cir. 2011). The court reasoned that the "same amount of danger" existed "in allowing habitual drug users to traffic in firearms" as "in allowing felons and mentally ill people to do so" because both "will have difficulty exercising self-control," particularly under the influence of controlled substances. *Id.* at 999. The Government argues that *Dugan* is not clearly irreconcilable with *Bruen* and thus, forecloses Hall's challenge. (Doc. 61 at 5).

"This Court is bound by Ninth Circuit precedent unless that precedent is 'effectively overruled,' which occurs when 'the reasoning or theory of our prior circuit authority is clearly irreconcilable with the reasoning or theory of intervening higher authority." *United States v. Butts*, 637 F. Supp. 3d 1134, 1138 (D. Mont. 2022) (quoting *Miller v. Gammie*, 335 F.3d 889, 893 (9th Cir. 2003)). "The clearly irreconcilable requirement is a high standard." *Close v. Sotheby's, Inc.*, 894 F.3d 1061, 1073 (9th Cir. 2018) (quotation marks omitted). "[I]t is not

enough for there to be some tension between the intervening higher authority and prior circuit precedent, or for the intervening higher authority to cast doubt on the prior circuit precedent." *Id.* (quotation marks omitted). Under this standard, the Court finds that *Dugan* is not clearly irreconcilable with *Bruen.*

The Government argues that *Bruen* did not overrule *Dugan*. Rather, the *Dugan* court "anticipated" the *Bruen* and *Rahimi* analyses when it relied "on the 'presumed constitutionality of longstanding regulatory measures' . . . to determine how and why [modern day] regulations are relevantly similar." (Doc. 61 at 6). Hall contests *Dugan*'s precedential value because it was decided before *Bruen* and so, the court "did not rely upon the *Bruen* framework." (Doc. 60 at 9).

The *Dugan* court, applying *Heller*, compared habitual drug user restrictions with felon and mentally ill restrictions. Compared to *Bruen* and *Rahimi,* the *Dugan* court employed a less extensive examination into "how" relevantly similar historical regulations to § 922(g)(3) addressed comparable problems and similarly, "why" those relevantly similar historical regulations placed a comparable burden on the right holder. *Dugan*, 657 F.3d at 999–1000 ("Because Congress may constitutionally deprive felons and mentally ill people of the right to possess and carry weapons, we conclude that Congress may also prohibit illegal drug users from possessing firearms."); *See Rahimi*, 602 U.S. at 692–93. Nevertheless, this Court finds that the *Dugan* court's theory is not clearly irreconcilable with *Bruen.*

"*Bruen* did not overrule prior precedent regarding gun-ownership prohibition when the basis for the prohibition arose from the application of *Heller*." *United States v. Hamlin*, CR-23-08-H, 2023 WL 6481146, *4 (D. Mont. Oct. 5, 2023). The *Bruen* Court held that a court must apply "[t]he test that we set forth in *Heller*" and "assess whether modern firearms regulations are consistent with the Second Amendment's text and historical understanding." *Bruen*, 597 U.S. at 56 (citing *District of Colombia v. Heller*, 554 U.S. 570 (2008)). The Ninth Circuit, applying *Heller*, concluded that habitual drug users in possession of firearms pose the same dangers as felons and the mentally ill and found § 922(g)(3) constitutional. *Dugan*, 657 F.3d at 999–1000.

Under this logic, the Court has denied § 922(g)(3) challenges since *Bruen* because the basis for the gun-ownership prohibition under *Dugan* arose from the application of *Heller*. *See United States v. Bulltail*, CR-22-86-BLG, 2023 WL 5458780 (D. Mont. Aug. 24, 2023); *United States v. Evenson*, CR-23-24-BLG, 2023 WL 3947828 (D. Mont. June 12, 2023); *United States v. Stennerson*, CR-22-139-BLG, 2023 WL 2214351 (D. Mont. Feb. 24, 2023). As before, this Court remains bound by Ninth Circuit precedent, and upon determining that *Dugan* is good law, finds § 922(g)(3) is constitutional.

Be that as it may, the Court recognizes that "*Bruen* effected a sea change in Second Amendment law." *Maryland Shall Issue, Inc. v. Moore*, 86 F.4th 1038,

1041 (4th Cir. 2023). For example, one Montana court has cast "doubt on whether *Dugan* remains binding precedent." *United States v. Youngblood*, __ F. Supp. 3d__ CR-24-22-M, 2024 WL 3449554 (D. Mont. July 17, 2024). Though this Court finds that the *Dugan* decision forecloses Hall's challenge, Hall asks the Court to reconsider the constitutionality of § 922(g)(3) under the *Bruen* and *Rahimi* frameworks. (Doc. 60 at 10–13). Provided the "sea change in Second Amendment law," the Court will consider the parties' arguments under the frameworks. *See Moore*, 86 F.4th at 1041.

*B. The* Bruen *and* Rahimi *Frameworks*

The Second Amendment guarantees as follows: "A well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed." U.S. Const. amend. II. In 2022, the Supreme Court decided *Bruen* finding that the Second Amendment's plain text coupled with an historical analysis of the Nation's gun regulation traditions protects an individual's right to carry a handgun for self defense. *Bruen*, 597. U.S. at 17, 28–29. The Court rejected the means-end scrutiny tests previously applied by appellate courts, holding instead that courts must apply "[t]he test set forth in *Heller*" to "assess whether modern firearms regulations are consistent with the Second Amendment's text and historical understanding." *Id.* at 26 (citing *Heller*, 554 U.S. 570).

Hall argues that § 922(g)(3) infringes upon her Second Amendment right because the statute is inconsistent with the history and tradition of firearm regulation. The Government counters that historical regulations demonstrate that Congress may disarm individuals when they pose a danger of misusing firearms, including individuals engaging in criminal activity, intoxicated individuals, and individuals of unsound mind. (Doc. 61 at 8–9).

Like other rights, Second Amendment rights are not unlimited. *Bruen*, 597 U.S. at 21. The "ever-evolving 'history-and-tradition' test outlined in *Bruen* and modified" by the Court's decision earlier this year in *Rahimi* "requires a two-step analysis to determine whether a law complies with the Second Amendment." *Youngblood*, 2024 WL 3449554, at *3 (citing 602 U.S at 740–43, (Jackson, J., concurring)).

First, if "the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct." *Bruen*, 597 U.S. at 24. Second, to regulate protected conduct, the government must show that its regulation "is consistent with the Nation's historical tradition of firearm regulation." *Id.* The historical analysis requires courts to pay close attention to "[w]hy and how the regulation burdens the right." *Rahimi*, 602 U.S. at 692; *Bruen*, 597 at 29. When engaging in analogical inquiry, "[a] court must ascertain whether the new law is 'relevantly similar' to laws that our tradition is understood to permit, 'applying

faithfully the balance struck by the founding generation to modern circumstances.'" *Rahimi*, 692 U.S. at 692 (quoting *Bruen*, 597 U.S. at 29); *see also Bruen*, 597 U.S. at 30 (requiring the government to "identify a well-established and representative historical *analogue*, not a historical *twin*.") (emphasis in original). Specifically, "the government must prove that the firearms regulation is part of the historical tradition that delimits the outer bounds of the right to keep and bear arms." *Bruen*, 597 U.S. at 20. "Only then may a court conclude that the individual's conduct falls outside the Second Amendment's 'unqualified command.'" *Id.* at 24 (quoting *Konigsberg v. State Bar of Cal.*, 366 U.S. 36, 50, n. 10 (1961).

*1. Plain Text*

The threshold question under *Bruen* is whether the Second Amendment applies to Hall. The right to keep and bear arms is held by "the people." U.S. Const. amend. II. Hall argues that her conduct is covered by the Second Amendment's plain text because she is an American citizen and possessed her firearm in common use. (Doc. 60 at 10). The Government does not address Hall's plain text argument.

In *Heller* and *Bruen*, the Court described the Second Amendment right as belonging to "law-abiding, responsible citizens." *Heller*, 554 U.S. at 635; *Bruen*, 597 U.S. at 15. Here, Hall is charged with possession and intent to distribute methamphetamine, but she has not been convicted. "[T]he Supreme Court has identified a longstanding tradition of prohibiting convicted *felons* from possessing

guns," but it has not said anything about the rights of arrestees. *United States v. Perez-Garcia*, 96 F.4th 1166, 1180 (9th Cir. 2024) (emphasis in original). Though there may be probable cause to believe Hall committed a crime, the Government failed to demonstrate why Hall should not be included in the category of "people" covered by the Second Amendment. Thus, the Court will follow Ninth Circuit guidance, and for the purposes of Hall's as-applied challenge, find that she is among "the people" within the meaning of the Second Amendment's "bare text." *Id.* ("In our view, to allow the government to exclude an entire group of individuals from 'the people' through mere accusation would be, at minimum, inconsistent with the presumption of innocence." (citing *United States v. Scott*, 450 F.3d 863, 874 (9th Cir. 2006) ("Defendant is, after all, constitutionally presumed to be innocent pending trial, and innocence can only raise an inference of innocence, not of guilt.")).

Similarly, the Government offers no argument countering Hall's proposed course of conduct. Because Hall claims she used the firearm "in common use," the Court concludes that the Second Amendment protects Hall's proposed course of conduct in her as-applied challenge. *See Bruen*, 597 U.S. at 32.

2. *Historical Tradition of Firearm Regulation*

Because Hall's conduct is protected by the Second Amendment, the Government must "justify [§ 922(g)(3)] by demonstrating that it is consistent with the Nation's historical tradition of firearm regulation." *Id.* at 17. The Government

argues that because the Nation has a historical tradition of disarming individuals of unsound mind, individuals engaging in crimes, and intoxicated individuals, it may do the same for users of controlled substances. (Doc. 61 at 9–12). Hall respectfully asks the Court to adopt the Fifth Circuit's reasoning in *United States v. Connelly* to find § 922(g)(3) unconstitutional as-applied to her. (Doc. 60 at 12–13; Doc. 62 at 3–4).

*a. Fifth Circuit Precedent*

The *Connelly* court, applying *Bruen*, found § 922(g)(3) unconstitutional as-applied to a "non-violent, marijuana smoking gunowner." 117 F.4th at 272, 282. The defendant, Paolo Connelly, was charged with violating § 922(g)(3) after officers found firearms and marijuana in her home. *Id.* at 272. Connelly admitted to habitual marijuana use for sleep aid and for anxiety. *Id.* The government offered "three buckets of historical analogues as support for § 922(g)(3)'s constitutionality: (1) laws disarming the mentally ill, (2) laws disarming 'dangerous' individuals, and (3) intoxication laws." *Id.* at 274–75. The court considered and rejected each. The court found that the Nation's history and tradition do not support disarming a sober person solely based on past substance usage. However, the court concluded that the Nation's history and tradition may support some limits or bans "on carrying firearms while an individual is *presently* under the influence." *Id.* at 272, 282 (emphasis in original). For example, the government could "succeed if it were able to demonstrate

that Paolo's drug use was so regular and heavy that it rendered her continually impaired." *Id.* at 277. Consequently, the court found § 922(g)(3) unconstitutional as-applied to Connelly. *Id.* at 282.

Hall asks the Court to adopt the Fifth Circuit's reasoning in *Connelly* and similarly find § 922(g)(3) unconstitutional as-applied to her. (Doc. 60 at 12). This Court is not bound by Fifth Circuit precedent but may rely on it as persuasive authority. Even if the Court adopted *Connelly*'s reasoning, Hall's as-applied challenge would likely fail. Unlike Connelly, Hall is not a "non-violent, marijuana smoking gunowner" who occasionally uses drugs. Hall is an admitted methamphetamine addict who uses intravenously. In addition to methamphetamine possession and use, the Government alleges Hall sold methamphetamine in 2021. Though neither party states whether Hall was presently on methamphetamine when law enforcement discovered her firearm, the stark difference between Hall's actions and Connelly's actions prevent this Court from adopting the reasoning discussed in *Connelly*.

In short, Hall's heavy drug use is incomparable to Connelly's occasional drug use. Further, as noted above, the Court is not bound by Fifth Circuit precedent. For these reasons, the Court will not apply the law to Hall's facts as the Fifth Circuit did in *Connelly*.

*b. Historical Analogues*

Rather, the Court will look to the Government's presentation of relevantly similar historical tradition. The Government "justif[ies] its regulation" by highlighting the Nation's historical tradition of disarming individuals posing "special dangers of misuse," including individuals engaged in criminal activity, intoxicated individuals, and individuals of unsound mind. *See Rahimi*, 602 U.S. at 691; (Doc. 61 at 7–10). Hall counters that the Government did not meet its burden at this step because it provided a "dearth of historical evidence." (Doc. 62 at 4). The Court finds the Government's presentation of relevant similar historical tradition related to individuals posing danger to public safety and intoxicated individuals sparse, but sufficient provided the "sea change in Second Amendment law."[1] Ultimately, the historical tradition of disarming individuals posing a danger to public safety and intoxicated individuals "impose a comparable burden" on the right to bear arms as § 922(g)(3). *See Bruen*, 597 at 29. "[Section 922(g)(3)] is by no means

[1] "While this Order relies on the parties' historical authority, consideration is also given to Justice Jackson's recent warning about the pitfalls of the *Bruen* methodology. Concurring in *Rahimi*, Justice Jackson cautioned: 'It is not clear what qualifies policymakers or their lawyers (who do not ordinarily have the specialized education, knowledge, or training of professional historians) to engaged in this kind of assessment . . . *Bruen* also conscripts parties and judges into service as amateur historians, casting about for similar historical circumstances.'" *Youngblood*, 2024 WL 3449554, at *4 n. 3 (quoting *Rahimi*, 602 U.S. at 745 n. 3 (Jackson, J., concurring). In addition to the parties' authority, the Court relies on additional legal precedent and relevant historical traditions in its analysis.

identical to these founding era regimes, but it does not need to be." *Rahimi*, 602 U.S. at 697.

Congress codified § 922(g)(3) when it passed the Gun Control Act of 1968. Gun Control Act, Pub. L. No. 90-618, 82 Stat. 1213, 1220 (1968). Congress's purpose for passing the Act was "to provide support to Federal, State, and local law enforcement officials in their fight against crime and violence." *Id.* at 1213. Congress did not intend "to place any undue or unnecessary Federal restrictions or burdens on law-abiding citizens . . . for the purpose of lawful activity." *Id.* at 1213-14. "The very structure of the Gun Control Act demonstrates that Congress . . . sought broadly to keep firearms away from the persons Congress classified as potentially irresponsible and dangerous." *Barrett v. United States*, 423 U.S. 212, 218 (1976). Section 922(g)(3) does not restrict ordinary citizens to the right to bear arms. "To sustain a conviction under § 922(g)(3), the government must prove . . . that the defendant took drugs with regularity, over an extended period of time, and contemporaneously with his purchase or possession of a firearm." *United States v. Purdy*, 264 F.3d 809, 812–13 (9th Cir. 2001).

In the recent Ninth Circuit case, *United States v. Perez-Garcia*, the court undertook a Second Amendment analysis comparing pretrial release conditions under the Bail Reform Act of 1984 to the Nation's historical tradition of firearm regulation. 96 F.4th 1166. The court found the pretrial release conditions

constitutional as-applied to the defendants. *Id.* Congress passed the Bail Reform Act to respond to "the alarming problem of crimes committed by persons on release." *United States v. Salerno*, 481 U.S. 739, 742 (1987). The statute "gives courts authority to make release decisions that recognize 'the danger a person may pose to others if released.'" *Perez-Garcia*, 96 F.4th at 1175 (quoting *Salerno*, 481 U.S. at 742). The government must justify the pretrial condition "by a showing that [the] defendant poses a heightened risk of misbehaving while [released] on bail." *United States v. Scott*, 450 F.3d 863, 874 (9th Cir. 2006). "In sum, the Bail Reform Act offers pretrial detainees freedom pending trial in exchange for abiding by a number of conditions designed to protect the public and secure the attendance of the accused at trial." *Perez-Garcia*, 96 F.4th at 1175.

Though the Bail Reform Act and the Gun Control Act are distinct legislative initiatives, the purposes are similar. Under the Gun Control Act, Congress identifies and classifies certain dangerous persons. Under the Bail Reform Act, the judiciary determines whether a person poses a threat to safety on pretrial release. In both cases, the classification and determination hinges on the protection of public safety. Under the Bail Reform Act, the government must prove the defendant poses a heightened risk of misbehaving. Under the Gun Control Act, specifically, § 922(g)(3), the government must prove the defendant regularly took drugs while possessing a firearm. In both cases, the government's interest is in regulating

persons posing an unusual danger, not in regulating ordinary citizens. Accordingly, it is proper for the Court to look to historical tradition regulating such individuals. And, thus, the Court relies on *Perez-Garcia*'s review of the Nation's historical tradition of regulating individuals who pose an unusual danger to public safety.

*i. Individuals Posing an Unusual Danger to Public Safety*

As analyzed by the Ninth Circuit, "the Anglo-American right to keep and bear arms for self-defense has always coexisted with legislative authority to disarm groups or individuals whose possession of firearms would pose an unusual danger, beyond the ordinary citizen, to themselves or others." *Id.* at 1189. In 17th century England, the English Bill of rights allowed the disarming of irresponsible subjects. *Id.* at 1186–87 (citing An Act Declaring the Rights and Liberties of the Subject and Settling the Succession of the Crowne ("1688–89 English Bill of Rights"), 1W. & M., Sess. 2, ch. 2, § 7, in 6 Statutes of the Realm 142–45 (Eng. 1688); Militia Act 1662, 13 & 14 Car. 2, c. 3, § 13.).

Subsequently and similarly, the American colonies adopted its own restrictions based on "contemporary fears and perceived threats." *Id.* at 1187 (For example, "Connecticut, Massachusetts, Pennsylvania, New Jersey, Virginia, and North Carolina all enacted disbarment laws targeting the disloyal and those that could not be trusted to respect the sovereign's authority." (citing Joseph G.S. Greenlee, *The Historical Justification for Prohibiting Dangerous Persons from*

*Possessing Arms*, 20 Wyo. L. Rev. 249, 263–65 (2020)). Pre and post ratification practice suggested that "legislatures could disarm individuals deemed dangerous or unlikely to follow the sovereign's laws." *Id.* at 1188 (citing 2 Bernard Schwartz, *The Bill of Rights: A Documentary History* 665, 675, 681 (1971) (Samuel Adams proposed that Congress may not "prevent the people of the United States, who are *peaceable* citizens, from keeping their own arms. (emphasis added)); (Anti-Federalist delegates proposed people should have the right to bear arms "unless for crimes committed, or real danger of public injury from individuals.); John Holmes, *The Statesman, or Principles of Legislation and Law* 186 (1840) ("[A] free citizen, if he demeans himself peaceably, is not to be disarmed.)).

Like the historical tradition of legislatures "exercising authority to disarm people whose possession of firearms would pose an unusual danger, beyond the ordinary citizen, to themselves, or others," § 922(g)(3) similarly allows the government to disarm individuals if Congress classifies them as "irresponsible and dangerous"—i.e., unlawful users of controlled substances. *See Perez-Garcia*, 96 F.4th at 1191; *Barrett*, 423 U.S. at 218. The illegal drug use of today was not a societal problem faced by the Founders, however, legislative authority to disarm individuals deemed a threat to public safety is not new and falls within the Nation's historical tradition of firearm regulation. *See Kanter v. Barr*, 919 F.3d 437, 458 (7th Cir. 2019) (Barrett, J., dissenting). Further, § 922(g)(3) "does not broadly prevent

law-abiding citizens with ordinary self-defense needs from exercising their right to keep and bear arms." *Perez-Garcia*, 96 F.4th at 1189. Under § 922(g)(3), the government must show that the defendant regularly took drugs over an extended period of time while she possessed a firearm.

Here, law enforcement found Hall to be in possession, to have used, and to have distributed methamphetamine. Because Hall admitted to "t[aking] drugs with regularity over an extended period of time" while possessing a firearm, she is part of the narrow segment of the population who Congress deems as potentially "dangerous" and "irresponsible." *See Purdy*, 264 F.3d at 812–13, *Barrett*, 423 U.S. at 218. Thus, Hall may be constitutionally disarmed under § 922(g)(3).

*ii. Intoxicated Individuals*

Like individuals who pose a danger to public safety, the Court finds there is similar historical tradition of temporarily disarming intoxicated individuals. In 1655, the Virginia colony enacted a law prohibiting individuals from "shoot[ing] any guns and drinking (marriages and funerals excepted) . . ." *1655 Va. Acts 401, Acts of March 10, 1655, Act XII*, Duke Ctr. For Firearms L., https://perma.cc/Q5KM-PD27, (last visited December 13, 2024). "In 1771, New York banned firing guns on New Year's Eve and the first two days of January to prevent 'great Damages . . . frequently done on [those days] by persons . . . with Guns and other Fire Arms and being often intoxicated with Liquor.'" *Youngblood*, 2024 WL 3449554, at *5

(quoting Ch. 1501, 5 Colonial Laws of New York 244–46 (1894); citing *Heller*, 554 U.S. at 632; *Rahimi*, 602 U.S. at 691). Further, "[i]n the early 19th Century, Rhode Island disarmed 'idiots, lunatics, common drunkards, paupers, [and] vagabonds' by excluding them from the militia services." *Id.* (quoting *An Act to regulate the Militia*, § 1, *reprinted in Public Laws of the State of Rhode-Island, An Act to Regulate the Militia*, § 1 & § 45 (Jan. 1844 Session of the General Assembly), Duke Ctr. For Firearms L., https://perma.cc/8J6C-JQHV, (last visited December 13, 2024).

The "historical tradition of disarming intoxicated individuals 'impose[s] a comparable burden' on the right to bear arms as § 922(g)(3)." *Youngblood*, 2024 WL 3449554, at *5 (citing *Bruen*, 597 U.S. at 29). Hall disagrees. Hall argues that historical intoxication laws restricted "the actual carrying of firearms by intoxicated people." (Doc. 62 at 6). Because Hall was not "carrying" a firearm, she argues § 922(g)(3) does not address a comparable problem to the historical regulations. The court, however, finds the intoxication laws "a well-established and representative historical *analogue*, not a historical *twin*." *See Bruen*, 597 U.S. at 30 (emphasis in original).

Like the intoxication laws, § 922(g)(3) disarms individuals who are users of a "mind-altering substance." *Youngblood*, WL 3449554, at *5. The intoxication laws relied on common sense terms like "common drunkards," likely indicating the

Founders did not require individual intoxication to be "extended" as required by the government to prove today. Further, intoxication laws created a more substantial burden on Second Amendment rights then § 922(g)(3) because they disarmed users of legal substances and did not seem to require any judicial determination of drunkenness prior to disbarment. *Id.* Section 922(g)(3)'s enforcement relies on the government's proof that the individual's use of controlled substances was with "regularity, over an extended period of time." *Purdy*, 264 F.3d at 812.

Here, as analyzed above, law enforcement found Hall to be in possession, to have used, and to have distributed methamphetamine. Although methamphetamine did not exist at the founding, it would be difficult to argue that it is "not more dangerous and intoxicating as alcohol." *Youngblood*, 2024 WL 3449554, at *6. Because Hall admitted to "t[aking] drugs with regularity over an extended period of time" while possessing a firearm, she may be constitutionally disarmed under § 922(g)(3).

## IV. Conclusion

IT IS ORDERED that Defendant Jennifer Michelle Hall's Motion to Dismiss (Doc. 59) is DENIED.

DATED this 23rd day of December, 2024.

Susan P. Watters
SUSAN P. WATTERS
United States District Judge